## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

**Ford Motor Company,**

         Plaintiff,

**v.**

**Versata Software, Inc., f/k/a Trilogy Software, Inc., Trilogy Development Group, Inc. and Trilogy, Inc.,**

         Defendants.

Case No. 2:15-cv-11264

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT

Pursuant to the Declaratory Judgment Act, 28 U.S.C. §2201, Plaintiff Ford Motor Company ("Ford") requests a Declaratory Judgment that Ford has not infringed any copyrights owned by defendants Versata Software, Inc. f/k/a Trilogy Software, Inc., Trilogy Development Group, Inc., and Trilogy, Inc. (individually and collectively "Defendants").

Ford's Complaint for Declaratory Judgment is based on the following allegations:



## I.     THE PARTIES

1.     Ford is a Delaware corporation with its principal place of business at One American Road, Dearborn, Michigan.

2.     On information and belief, Versata Software, Inc. f/k/a Trilogy Software, Inc. ("Versata") is a Delaware corporation having its principal place of business in Austin, TX.

3.     On information and belief, Trilogy Development Group, Inc. ("Trilogy Development") is a California corporation having its principal place of business in Austin, TX.

4.     On information and belief, Versata became a wholly-owned subsidiary of Trilogy Development in 2006, and Trilogy Development is the parent company of Versata and its subsidiaries.

5.     On information and belief, Trilogy, Inc. is a Delaware corporation having its principal place of business in Austin, TX.

## II.     JURISDICTION AND VENUE

6.     Ford incorporates the allegations of paragraphs 1-5.

7.     This Court has jurisdiction over these claims pursuant to 28 U.S.C. §§1331, 1338, and 2201.



8.     As detailed below, an actual case and controversy exists concerning the alleged infringement of one or more of Defendants' copyrights.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b).

### III.    BACKGROUND FACTS

10.     Ford incorporates the allegations of paragraphs 1-9.

*Ford's Early Vehicle Configuration Software*

11.     Ford is an Original Equipment Manufacturer ("OEM") of automobiles.

12.     Ford sells a wide range of vehicle lines in different vehicle categories, such as compact cars, SUVs, sedans and pick-up trucks.  Each vehicle line in each category has many different configurations and options.  For example, most vehicles are offered with more than one engine choice, more than one transmission choice, more than one wheel choice and several other configurations and options.

13.     Not all vehicle components are compatible with one another.  For example, a particular engine may not be compatible with a particular transmission. A particular transmission, however, may be compatible with several different (but not all) available engine selections.



14.     Given the complexity and options available on a particular vehicle, millions of configurations are possible for each vehicle line.

15.     Beginning in the 1990s, Ford developed the Marketing Feature Availability List ("MFAL") and the "Product Feature Database" ("PFDB") software to help Ford define and manage valid vehicle configurations within Ford.

***Defendants' Configuration Software***

16.     In October 1998, Ford licensed "SC Config" software from Defendants.  The SC Config software proved incapable of handling the complexity and volume of data required to support Ford's needs.

17.     So, at the same time Ford licensed SC Config, Ford and Defendants entered into in a Contract Services Agreement ("CSA") for the development of customized software for Ford.

18.     The CSA states that Ford either owns, or has a royalty-free license to reproduce the software deliverables and customizations for the SC Config software.

19.     Between 1999 and 2004, Defendants and Ford jointly developed the "Automotive Configuration Manager" ("ACM") pursuant to the CSA.



4

20.    The ACM was an adaptation of SC Config for use within Ford.  This was required due to the high levels of data volumes and the complexity of Ford's vehicle offerings.

21.    Ford paid Defendants tens of millions of dollars for the ACM development services pursuant to the CSA.

22.    In December 2004, Ford and Defendants entered into a Master Subscription and Services Agreement ("MSSA"), governing the licensing of, *inter alia*, the ACM software.

23.    Similar to the CSA, the MSSA included provisions establishing Ford's ownership, or license to reproduce, deliverables created under the MSSA.

***Defendants Unilaterally Declare The ACM Software "Obsolete" And Terminate Ford's Maintenance & Support For The ACM Software***

24.    In November 2010, Defendants informed Ford that the ACM software was "obsolete," and that Ford was required to license Defendants' new "cloud-based" computing platform going forward.  For security reasons, Ford was not willing to move its proprietary vehicle configuration data off-premises to the "cloud," *i.e.*, the Internet.

25.    Prior to these discussions, Defendants threatened Ford with termination of the license for the original ACM software if Ford refused to move to the "cloud-based" platform.



26.     During subsequent discussions with Ford, however, Defendants later permitted Ford to continue using the "obsolete" ACM software at an annual license fee of several million dollars, but without Defendants' maintenance or support services.

27.     However, Ford and Defendants ultimately entered into an agreement that provided Ford with maintenance and support services for an extended period. Under the agreement, an addendum to the ACM license, Ford paid Defendants a substantial additional fee for an "Extended Support Term" for the original ACM software and for Defendants to waive their right to terminate the ACM license for convenience during the Extended Support Term.

***Defendants Terminated Ford's ACM License, And Described Their Exorbitant Licensing Fees As "Extortion"***

28.     Defendants notified Ford on October 7, 2014 that they were terminating Ford's ACM license, effective January 1, 2015. Defendants' letter stated that Ford was to cease using the ACM software by January 1, 2015.

29.     On November 13, 2014, Defendants extended the termination date to January 15, 2015 and again stated that Ford was to cease using the ACM software by the extended date.



30.    In parallel with these termination notices, Defendants offered Ford new license terms for Defendants' "obsolete" ACM software that Ford had been using since 2005.

31.    Defendants' new licensing proposal was for 5 years at a dollar amount that is incrementally greater than the amount Ford would have paid for the exact same "obsolete" ACM software previously licensed to Ford on an annual basis.

32.    During a conference call regarding Defendants' new licensing proposal, a Defendant representative stated to Ford representatives that "we could have extorted a lot more money out of you three years ago."

33.    Ford did not accept Defendants' unreasonable license proposal.  On December 19, 2014, Ford notified Defendants that Ford would no longer be using the ACM software.

***Ford Research Engineers Invented, Developed And Patented Their Own Configuration Software; Defendants Forced Ford To Changeover***

34.    Defendants' October 2014 notice that the ACM license would be terminated in January 2015 prompted Ford to expedite the implementation of alternate software that it began developing when Defendants' threats first began. In 2010, engineers from Ford's Research and Advanced Engineering department began working to develop software that Ford might use in the future to determine which vehicle configurations sell the best.



7

35.     The objective of the new software was to determine, of the millions of possible vehicle configurations, which configurations were likely to sell the quickest to minimize the amount of time the vehicles sit in dealer inventory, referred to as "days on lot."

36.     To accomplish this objective, the engineers needed to swiftly define and analyze millions of possible vehicle configurations, all in an attempt to narrow the universe of possible configurations to those buildable configurations relevant to an individual dealer and further constrained to avoid combinations of options likely to lengthen the "days on lot."

37.     Ford's research engineers ultimately invented software that managed the millions of possible vehicle configurations very reliably, and in a very efficient manner.  The engineers referred to their invention as the "super configurator."

38.     In parallel with Ford's efforts in research, Ford Product Definition engineers were trying to better understand vehicle complexity so that they could reduce number of manufactured configurations and ultimately reduce cost.  These efforts utilized the output of the Feature Query Validation (FQV) Service and data from ACM rule reports.  The efforts yielded some basic tools to assess complexity and some proofs-of-concept, but proved to be of limited broader use due to the computing power required.  Analyzing moderately complex programs required a



8

supercomputer to run for days and complex programs failed to complete processing.

39.    In 2011, Ford's Product Definition engineers and Research engineers recognized that the super configurator technology developed in Ford's research department was orders of magnitude more powerful than the approaches developed using FQV or ACM.  The super configurator was able to work successfully with vehicle programs of great complexity.  Also, with the greater processing power, the super configurator technology could enable many uses beyond the simple complexity assessments that were initially targeted by the Product Definition engineers.  The new technology could be used as the basis for a replacement for the ACM software – software that Defendants had declared "obsolete" and threatened to terminate.

40.    The two teams joined forces and, under the heading of Total Configuration Management (TCM), continued to improve the performance and extend the capabilities of the super configuration technology.

41.    Ford filed a patent application on its super configurator software in October 2011, and received a patent covering its invention in August 2014, U.S. Patent No. 8,812,375 (the '375 patent).

42.    As explained in the '375 Patent, Ford's invention approaches vehicle configuration very differently, and more efficiently, than Defendants do.



9

43.     Ford disclosed Defendants' configuration patents to the U.S. Patent & Trademark Office ("PTO") during examination of the '375 Patent.  The PTO allowed Ford's '375 patent over Defendants' patents because Ford's software operates fundamentally differently.

44.     From 2011 to 2014, Ford developed the "PDO" vehicle configuration software to replace the obsolete ACM software.  Ford's PDO software was constructed using Ford's patented super configurator invention and provides several significant technical advantages over the ACM software.

45.     For example, the patented configuration engine used in Ford's PDO software is more accurate than the ACM software, providing Ford with higher data integrity than the ACM software.

46.     In addition, Ford's PDO software provides a foundation that is capable of managing in a coherent manner a broad range of related data including integrating data representing vehicle volumes, configuration mix and weight – something the ACM software cannot do.  The PDO software also provides the potential for extended analytic capabilities over the ACM software.

47.     Another significant advantage of Ford's PDO software over the ACM software is that PDO has been architected to support future extensions planned to enable Ford's business people to easily define vehicle configurations themselves, without requiring the expert configuration codification analysts that the ACM



software required.  This will dramatically increase the efficiency and utility of the configuration software within Ford.

48.    Ford's PDO software also allows Ford to develop and deploy reusable powerful global data services.  ACM was geared to support a small group of core codification analysts and was not capable of handling high volumes of complex real-time data requests.   PDO is architected to support hundreds of users interacting with PDO data services on a daily basis.

49.    From the hardware perspective, Ford's PDO software runs on a modern computing platform, which is more closely aligned with Ford's computing infrastructure strategy.

50.    Ford's PDO software is also scalable to meet Ford's global needs without a significant upgrade, unlike the ACM software.

51.    Driven by the technical drawbacks of the ACM software, Defendants' repeated termination notices, and their unreasonable unilateral escalation of license fees (which Defendants referred to as "extortion"), Ford was forced to incur costs to prepare and deploy the patented PDO software into production prior to January 1, 2015.



11

***Defendants Threatened Ford With Patent Infringement, Copyright Infringement, And Misappropriation of Trade Secrets, and Demanded an Audit of Ford's PDO Software and Ford's PDO Developers***

52. In its termination letter sent October 7, 2014, Defendants attached a list of 86 U.S. patents and stated that Ford "has no right nor license to use any such claimed inventions outside of its now expiring licensed use of [Defendants'] Software."

53. At a meeting in Dearborn, MI on December 19, 2014 between counsel and client representatives for Defendants and Ford, Ford notified Defendants of Ford's intention to switch to Ford's patented configuration software. A representative of Defendants responded stating that Ford's replacement configuration software must infringe Defendants' intellectual property, including its patents, copyrights and trade secrets.

54. On December 23, 2014, Defendants notified Ford of their "inten[t] to exercise its on-premises audit rights pursuant to Section 3.5 of the [MSSA]." In particular, Defendants demanded an audit of "the development of an internal (or third party) Ford solution to replace [Defendants'] Software."

55. Defendants' audit notice also requested interviews of "Ford personnel who at any time worked with any of [Defendants'] Software, Materials, Confidential Information and/or Intellectual Property and also who at any time



worked on the development of a Ford internal (or third party) solution to replace [Defendants'] Software."

56.    In a second meeting between the parties on March 27, 2015, Defendants again asserted that Ford's PDO software infringes Defendants' copyrights. Defendants further threatened to seek damages, including disgorgement of Ford's profits, for the alleged copyright infringement.

57.    There is no factual basis for Defendants' claims of copyright infringement. Ford's PDO software was independently developed by Ford and includes no ACM software.

## COUNT #1:
## DECLARATORY JUDGMENT OF
## NON-INFRINGEMENT (COPYRIGHT)

58.    Ford incorporates the allegations of paragraphs 1-57.

59.    Defendants claim that the ACM software is protected under the Copyright Act, 17 U.S.C. §501, *et seq.* and that Ford's PDO software infringes Defendants' copyrights.

60.    However, Ford did not copy or use any portion of the ACM software to create the PDO software.

61.    Ford's PDO software is not derived from the ACM software and is not based in whole or part on the ACM software.



13

62.    Ford's PDO software and the ACM software are not substantially similar. On the contrary, they function in distinctly and fundamentally different ways, with the PDO software offering greater efficiency, functionality, and other technical advantages absent from the ACM software.

63.    For at least these reasons, Ford's use of the PDO software does not violate Defendants' alleged rights under the Copyright Act.

64.    Because of Defendants' allegations, an actual, present and justiciable controversy has arisen between Ford and Defendants concerning Ford's right to use the PDO software.

65.    Therefore, Ford seeks a declaratory judgment from this Court that its use of the PDO software does not infringe any rights Defendants claim under the Copyright Act or otherwise violate other applicable federal or state laws.

## IV.   RELIEF REQUESTED

Ford prays that this Court enter judgment against Defendants and in favor of Ford on its claims as follows:

a. For a declaration that Defendants' alleged rights under the Copyright Act, or other applicable federal or state laws, are not infringed or otherwise violated by Ford's use of the PDO software;



14

b.  For recovery of damages adequate to compensate Ford for Defendants' baseless allegations of infringement and threats of litigation;

c.  For an assessment against Defendants for Ford's costs and attorneys' fees;

d.  For a declaration permanently enjoining Defendants from asserting claims against Ford, filing actions against Ford, maintaining actions against Ford, or making threats against Ford for infringement or interfering in any way in Ford's use of the PDO software; and

e.  For such other relief as the Court may deem just and proper.



## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b) and 5(d), Plaintiff demands a jury trial of all issues triable by jury.


Dated:  April 2, 2015                    Respectfully submitted,

                                         By: /s/ John S. LeRoy
                                         John S. LeRoy (P61964)
                                         Frank A. Angileri (P45611)
                                         Chanille Carswell (P53754)
                                         John P. Rondini (P72254)
                                         **BROOKS KUSHMAN P.C.**
                                         1000 Town Center, 22nd Floor
                                         Southfield, MI  48075
                                         Tel.: 248-358-4400 / Fax: 248-358-3351
                                         jleroy@brookskushman.com
                                         fangileri@brookskushman.com
                                         ccarswell@brookskushman.com
                                         jrondini@brookskushman.com

                                         *Attorneys for Plaintiff, Ford Motor Company*

